Marcus R. Mumford (Utah Bar No. 12737)
MUMFORD PC
405 South Main, Suite 975
Salt Lake City, UT 84111
(801) 428-2000
mrm@mumfordpc.com
*Attorney for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| United States of America, | Case No. 2:09-cr-302-CW-EJF |
|---|---|
| *Plaintiff*, v. Claud R. Koerber, a/k/a Rick Koerber, *Defendant*. | SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR IMPERMISSABLE DELAY BASED ON NEW EVIDENCE PRESENTED IN THE GOVERNMENT'S JULY 7, 2014 PRODUCTION OF DISCOVERY<br><br>Judge Clark Waddoups<br>Magistrate Judge Evelyn J. Furse |

At oral argument held June 19, 2014, on Defendant's motion to dismiss for impermissible delay, the Court announced that it would dismiss this case, and took under advisement whether dismissal would be with prejudice. Defendant argued that it should be dismissed with prejudice pursuant to the Speedy Trial Act, and the Fifth and Sixth Amendments, based on the prejudice he has suffered, the prosecution's tactical pre- and/or post-indictment delay, and other violations of due process.

Defendant files this supplemental brief in further support of his motion to dismiss this case, with prejudice. (*See, e.g., Reply* Dkt 456)  This submission is based on <u>new evidence</u> the government produced on July 7, 2014, which shows how the government has caused <u>additional prejudice</u> to Defendant through its delay, negligence, and tactical decisions to circumvent Defendant's due process rights.   This new evidence also rebuts the government's argument that Defendant should bear the blame for delay in the case.

On July 7, 2014, as the parties waited for the court's decision, the government surprisingly emailed notice to Defendant of a new "supplemental discovery production." The production included approximately 1,400 pages. (Dkt 469) Most of the evidence was between one and four years old, and clearly has been in the government's possession for a long time. There was no explanation for the late production, no description of the content, no table of contents, and no index. Also, among other things, it appears the government buried in this production of <u>new evidence</u> significant *Brady* and *Giglio* material that it has had in its possession for at least 18 months prior. *See, e.g., Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates [Fifth Amendment] due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."); *Strickler v. Greene*, 527 U.S. 263, 280 (1999) ("[T]he duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).").

**FBI302-054-0021 and -0022**

The government's production includes <u>for the first time</u> a memo documenting a February 25, 2010, meeting between AUSA Walz, FBI Agent Saxey, Utah Department of Commerce Deputy Director Thad Lavar, and Utah Division of Securities Enforcement Director Michael Hines. The "purpose of the meeting" was to discuss a "three inch" thick stack of documents the

State gave Walz in February 2010. FBI302-054-0021.[1] Importantly, the memo reveals how Michael Hines told Walz and Saxey that, as a result of his work on the case, Hines "did not have enough evidence in his possession to bring civil and/or criminal charges against Koerber." FBI302-054-0022. Finally, the memo discusses the relationship that attorney Jennifer Korb had with others in the investigation and prosecution. Id.

These facts raise significant issues of both impeachment and exculpatory evidence. Confirmation in February 2010 that Hines never had evidence to proceed civilly or criminally against Defendant rebuts arguments the government was asserting at that time in opposition to Defendant's motion to compel the return of privileged information, in particular the government's arguments regarding the crime-fraud exception to the attorney-client privilege. Hines' statement further shows why the government expended so much effort to try and anticipate Defendant's advice of counsel defense. Finally, the Court will recall the testimony of SAUSA Jen Korb and Agent Saxey at the November 2012 suppression hearing. Agent Saxey testified, *inter alia*, that he had not worked with Hines (11/08/12 Tr. 66:15), and SAUSA Korb testified regarding the coordination between the State of Utah and the United States Attorneys Office. This newly produced memo appears to contradict the government prior positions.

**UTAG-01-0003**

The government's production also includes a January 24, 2013 email between AUSA Stew Walz and Utah Division of Securities Director Keith Woodwell. The email includes a discussion about a voice mail message Woodwell apparently left for Walz concerning a "new matter" the Division was going to initiate against one of the government's primary witnesses in

---

[1] It remains unclear whether this 3-inch stack of documents has been produced. Defendant has searched over the last two weeks through the government's many prior productions, and has not been able to identify any documents matching the description or source described.

3

this case, Michael Isom. The government has never produced the voice mail. Further, the email admits that it "impact[s] [the government's] Brady/Giglio obligation [on] our Koerber case." UTAG-01-0003. Walz also asked for "information that can be used to impeach Mr. Isom." This is the first time Defendant is learning about these matters.

      This is significant because of the central role Isom plays for virtually all of the factual statements in the indictment's scheme and artifice to defraud section. Also, Isom is directly involved in the allegations of counts 4-6, 7, 9, 11, 13. Further, this new information bears on the motion to suppress recently filed by Defendant, complaining how the government has used its relationship with Isom and his attorney, Brad Jacobson (who has also been Defendant's attorney), to intrude on Defendant's privileged information. It appears that the government has been sitting on this information for almost 18 months, concealing it until after the pre-trial motion cut-off, and during the time in which it opposed Defendant's motion to suppress regarding Isom and Jacobsen based on an argument by the government that Defendant's motion lacked sufficient evidentiary support. This is an example of the very problem Defendant has previously rehearsed regarding the government's pattern of strategic delay over the last five years. By once again delaying its production of critical discovery (particularly without explanation or justification) the government has deliberately prejudiced Defendant by taking off the table (for months and sometimes years) information and arguments related to Defendant's pre-trial motion practice, only to simultaneously complain that it is Defendant who should be held responsible for delays in the case. Instead, this pattern shows either strategic delay on the part of government prosecutors or a pattern of serious negligence. Either way, this behavior by government prosecutors causes unfair and unjustified delay and prejudice, and only the government can be fairly held to account for this consequence.

**UTDOC-51-00001 thru -00006**

The government produced <u>for the first time</u> a document entitled "CRK Associated Entities" and a "Verification of Files on CDs," from the State of Utah to FBI Agent Cameron Saxey, and dated March 2010, showing among other things how Defendant's activities with Founders Capital and other entities involved his attorney Jeffery R. Thompson. UTDOC-51-00001 thru 00003. These documents raise significant issues related to the government's prior knowledge of Defendant's relationship with his attorneys, and the relative timeframe and scope of that representation. Also, the materials appear to contradict the government's prior representations regarding its supposed "verification" of the specific contents of the previously controversial Rachelle Taylor CD. UTDOC-51-00006.

**ACC-02-00001 thru -00189**

The government's production made available <u>for the first time</u> one hundred and eighty nine pages of information related to Defendant's adoption of multiple children between 2005 through 2007. It is not clear when the government came into possession of this information, but this information clearly shows that contrary to the government's allegations, Indictment ¶ 15, the money Defendant spent on adoptions did not come from investors or from Founders Capital, as alleged in the indictment. *See, e.g.*, ACC-02-00096.

This information also contains a signed letter from "Les McGuire, MBA" stating that he is "writing on behalf of C. Rick and Michelle Koerber" as the "founding partner" of a "Personal Macro-economics firm" and that he had "served as an economic and financial advisor to them in both their businesses and in their personal lives." Significantly, Mr. McGuire explains in the letter that he was "intimately familiar with their financial situation and the health and condition of their business interests." Mr. McGuire's letter also includes his professional opinion that

"the Koerbers are in an extremely strong, healthy financial position" and that "[t]heir assets are growing at a rapid but sustainable pace, and their cash flow position is healthy, running consistent surpluses, and growing stronger." Mr. McGuire also concludes at one point in the letter that: "I consider their business and personal financial condition to be among the strongest of all my clients…In fact, I think so highly of Rick's abilities as an entrepreneur and businessman that I have partnered with him myself on a few new ventures. I would not risk my capital, time, or reputation with anyone unless I was completely satisfied that they maintain the highest standards of integrity and have demonstrated consistent ability to profitably run and grow a business, as well as manage cash flow and other resources." *See* ACC-02-00182. Relevant to the last two counts of the indictment, Mr. McGuire's letter also addresses Defendant's tax situation, explaining how "a tax return is a very poor and misleading indicator of financial health" and why they legally pay "little to no income tax." *Id*. This information is clear Brady material that contradicts the government's key allegations that Defendant was running a "Ponzi scheme" and evading the payment of taxes.

**ACC-02-00189**

Similarly, the government's production made available <u>for the first time</u>, a September 21, 2005 letter from David Kirby, then branch manager of Chase Bank, providing a "credit reference for C. Rick Koerber," based on his status as "a business and personal customer of JP Morgan Chase Bank NA for more than 2 years" and detailing how "Mr. Koerber has always maintained sufficient assets with JP Morgan Chase Bank NA and has satisfied all payments on his lending relationships" and "has always been credit worthy with JP Morgan Chase Bank NA." ACC-02-00189.

**FBI302-182-0001 thru -0002**

The government's production also made available <u>for the first time</u> a December 2009 email exchange between FBI Agent Cameron Saxey and Kerry Sharp, wherein Sharp reportedly told Agent Saxey that "Lawyers that advised Rick that he was not breaking the law should be accountable." *See* FBI302-182-0001.  This relates directly to the government's knowledge and awareness of Defendant's potential "advise of counsel" defense that the government has worked deliberately and strategically to disrupte, and its potential affect on government witnesses.

ARGUMENT

The government has sought to excuse its actions prejudicing Defendant and violating the Speedy Trial Act and other authority, by seeking to blame Defendant.  In response, Defendant has pointed out how his motions (and his related requests for extra time to review discovery and prepare pre-trial motions) were made necessary by the government's own neglect and deliberate strategic delay related, often times, directly to its withholding of essential discovery.  (Dkt 456) Regarding the "impact of reprosecution" Defendant has shown how the prejudice he has suffered will unfairly continue with any reprosecution, especially given the Court's August 15, 2013 ruling, the need for a *Kastigar* hearing to determine the extent and "fruits" of the government's past transgressions, prosecutor's actions in previously concealing the Rachelle Taylor disc in response to Defendant's February 2010 motion, the government's unexplained delay in taking over a year to certify that it had finished providing all discovery to Defendant, and how the weight of "official negligence compounds over time as the presumption of evidentiary prejudice grows" and the law's "toleration of such negligence varies inversely with its protractedness…and its consequent threat to the fairness of the accused's trial." *Doggett v. United States*, 505 U.S. 647, 657 (1992).

Now, this new evidence raises new questions concerning additional governmental misconduct in this matter.  Why did it take the government until July 2014 to produce exculpatory information that it had in its possession as of 2010, if not sooner, including information that it specifically identified as "Brady/Giglio" in January 2013, while this Court was considering arguments concerning the actions of prosecutors violating Defendant's due process rights?

On August 31, 2010, (Dkt 94), the government represented to the Defense and to the court that it had already "provided all discovery."  Further, prosecutors have repeatedly provided false reassurances to the Court (including recently) that that government has "double check[ed] its files to ensure that all discovery had been provided" (Dkt. 431 at 11), that Defendant "has access to all discovery in this document-intensive case" (Dkt. 437 at 9) and that "the United States has provided and continues to provide full discovery to the Defendant" (Dkt. 459 at 4, 6).  But, the evidence cited above (and much more of the recently produced 1,400 pages) was in its possession when these statements were made – clearly demonstrating the deceptive nature of these assurances and claims by prosecutors.   Further, the recently produced emails of Walz and Saxey are clearly date stamped, and retrieved from electronic sources such as Yahoo Mail accounts and the government's email system.  There is absolutely no explanation given as to how or why this information was withheld, and there has been no effort by the government to correct its past statements and false assurances.

On February 1, 2012, Defendant raised this same issue pursuant to both Rule 16 and *Brady* and *Giglio*.  *See* Dkt. 219, Defendant's "Motion to Compel Discovery."  ("Defendant identified and requested over a year ago more than 50 separate discs/files referenced in, but missing from, materials the government produced…[and] the government has previously

8

demonstrated its willingness to hide important evidence to Defendant's case…[and Defendant] has been prejudiced because missing discovery is necessary for his case preparation and is likely to reveal additional grounds and bases for pretrial motions.")  Tellingly, the government's response even at that time was, "we believe the case needs to progress more quickly." *Id*.  But, this is the problem.  On one hand, the government has worked to maintain the appearance of wanting to push the case along and claim that it needs to "progress more quickly," while on the other hand and at the very same time – since 2009 – it has sought to prejudice Defendant's trial strategy, frustrated his ability to see all relevant and exculpatory evidence, shaped its case to Defendant's anticipated trial strategy, and purposefully or negligently misled Defendant and the Court regarding discovery.

     Defendant argued in February 2012 that "the government must not be allowed to circumvent the discovery process or conceal relevant evidence until a later date, where Defendant will have less time to review and raise issues prior to trial."  That is exactly what this late production confirms.  Take for example, the bates-numbering related to the memo containing the statement from Michael Hines that he never had evidence to pursue Defendant criminally or civilly.  That document was bates-numbered FBI302-054-0021 to -0022.  The government <u>previously</u> disclosed FBI302-054-0001 through -0020 but apparently waited until <u>after</u> the suppression hearing(s), <u>after</u> the pre-trial motion cut-off, <u>after</u> Defendant's motion to dismiss for delay, and <u>after</u> the court has announced that the case will be dismissed, to now reveal the rest of the documents -0021 and -0022.

     Viewed in isolation, perhaps the government can explain its delay.  But the culmination of these instances, evidences that the government harbors plain and persistent disregard for Defendant's due process rights.  Regardless of the government's intent, Defendant is prejudiced

because he cannot go back now and litigate, cross-examine, and petition for his rights from a position of strength. More directly, by strategically delaying the production of discovery, the government has kept Defendant in the dark regarding potentially favorable witness testimony and worked to hinder his "advise of counsel" defense. The government has argued how discovery in this case has been "complex," but the disclosure obligations concerning favorable and exculpatory information are as simple as they are fundamental.

This belated disclosure of material directly undercut's any credibility to the government's argument that dismissal should be "without prejudice" because of its "efforts to ensure that all discovery had been provided" in 2010. (Dkt 437 at 8.)  Clearly, the government has not been accurate or reliable with the Court on this topic, and the prejudice Defendant has suffered can only compound with reprosecution. These questions and related implications also extend to prosecutor's actions in front of the grand jury if they knowingly presented false information regarding Defendant's financial affairs (including the supposed source of money used by Defendant to adopt children). "As long ago as *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), we said, '(t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' *Id*. at 269." *Giglio v. United States*, 405 U.S. 150, 153 (1972).

The July 7, 2014 production sheds additional light on the government's motives in strategically delaying the production of this discovery (as it has done with prior significant discovery) until Defendant would be unable to exercise his due process rights fully and fairly.

> As a result, it is irrelevant for *Brady* purposes " 'whether the nondisclosure was a result of negligence or design.' " *Buchanan*, 891 F.2d at 1442 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *see also Brady*, 373 U.S. at 87 (noting that suppression of material exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution"); *United States v. Pedraza*, 27 F.3d 1515, 1527 (10th Cir. 1994) (same); *United States v. Montoya*, 716 F.2d 1340, 1345–46 (10th Cir. 1983).

*Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995).

## CONCLUSION

The new evidence made available in the government's recent production shows further reason why the Court should dismiss this case with prejudice, and put an end to this ill-conceived and ill-pursued prosecution. The unfairness and prior misconduct of prosecutors has already tainted this matter so significantly that the full fruit and full extent of that prejudice still remains undefined (pending Kastigar litigation) and the already established unfairness and Constitutional impermissibility is further exacerbated by the government's continuing pattern of unfairness, strategic nondisclosure and neglect. When the Speedy Trial Act requires dismissal, as it does in this case, Congress has given the court discretion to consider whether – in light of this serious violation of federal law – such dismissal should foreclose reprosecution.

At first glance, the above question might naturally be framed as a question of whether the government should be allowed to continue prosecuting a case against a businessman alleged to have engaged in serious wrongdoing. But, given the facts and history of this case, the more significant question is whether or not the government, after having shown intentional and serious disregard for professional ethics, federal law, and Constitutional due process both in how it initiated and prosecuted this case, and now after having also failed to bring this same Defendant to trial within the time allowed by Congress (and thereby further violating federal law), should be allowed to reprosecute in the face of further disregard for fairness.

At some point, the interests of the public and this Defendant – sharing a fundamental right to liberty and justice – require that the government be held to account for its misconduct, for example, to prevent the "erosion of 'citizens' faith in the even-handed administration of the laws.'" (Dkt 360 at 60)  As the Supreme Court recently announced in its unanimous decision vindicating Fourth Amendment principles, "the Founders did not fight a revolution to gain the right to government agency protocols." *Riley v. California*, 134 S. Ct. 2473, 2491 (2014)

Over the last five years, the government has demonstrated a pattern of unethical, unlawful, and unfair conduct in its pursuit of this case. In addition to the other Fifth Amendment violations addressed by this Court in its August 2013 order, and the pending arguments raised by Defendant, the government has indisputably failed to provide timely discovery, has repeatedly made false representations regarding the status of critical discovery, and as a result bears culpability for the prejudicial delay in bringing this case to trial, compromising Defendants' ability to use evidence in prior proceedings before this court, and in preparations to this point. Defendant, therefore, respectfully submits this supplemental memorandum to further support his argument that the case be finally dismissed, with prejudice.

DATED:  July 21, 2014

*/s/ Marcus R. Mumford*
Attorney for Defendant